FILED

04/16/2020

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs November 14, 2019

## STATE OF TENNESSEE v. SHERMOND DEWAYNE DILLARD, JR.

**Appeal from the Criminal Court for Davidson County**
**No. 2017-A-572     Angelita Blackshear Dalton, Judge**

_____

### No. M2018-02268-CCA-R3-CD
_____

A Davidson County jury convicted the defendant, Shermond Dewayne Dillard, Jr., of aggravated robbery, for which he received a ten-year sentence.  On appeal, the defendant argues the trial court should have granted a new trial based on the admission of irrelevant and unfairly prejudicial testimony and improper closing argument by the State.  The defendant also contends the trial court erred in sentencing him.  After reviewing the record and considering the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined. NORMA MCGEE OGLE, J. filed a separate opinion concurring in part and dissenting in part.

Timothy Carter, Nashville, Tennessee, for the appellant, Shermond Dewayne Dillard, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Joseph E. Clifton, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### *Factual Background*

*A.  Trial*

Shortly after 9:00 p.m. on December 4, 2016, the victim was riding his bicycle home from work when he was suddenly "boxed in" by a silver Chevrolet Malibu.  Two

men exited the back seat of the Malibu and approached the victim. The defendant approached the victim from the left, and his accomplice approached the victim from the right. Both men were armed and pointed handguns at the victim. The defendant's accomplice had a "brushed steel . . . semi-automatic pistol" with "a matt[e] finish;" whereas, the defendant "had more of a shinier chromish (sic) finish semi-automatic handgun." The accomplice demanded the victim give him "everything," and the victim surrendered his backpack. The defendant then patted the victim's pant leg, and the victim surrendered his wallet. The two men returned to the back seat of the Malibu and drove away. The victim testified he was afraid during the robbery.

An unidentified individual witnessed the robbery and called 9-1-1. Officer Gordon Stovall of the Metro Nashville Police Department ("MNPD") responded to the 9-1-1 call and was informed by the victim that the suspects had robbed him at gunpoint and were in a silver Chevrolet Malibu. According to Officer Stovall, the victim was "adamant" when describing the guns as a "Bersa .380 and a chrome semi-auto pistol." When asked if different brands can make similar looking weapons, Officer Stovall answered, "[a]bsolutely."

A few hours before the robbery, at approximately 4:15 p.m., Corey Battle's rental car, a silver Chevrolet Malibu, was stolen from his friend's driveway. A security camera recorded the two individuals who stole the vehicle, but the footage did not reveal their identities. Using the vehicle's OnStar navigation system, law enforcement was able to track and recover the vehicle at the Days Inn Hotel on December 6, 2016. The officers had the vehicle impounded but made no arrests at that time.

On December 7, 2016, Detective John Wright of the MNPD Auto Theft Unit searched the impounded silver Malibu. During the search, Detective Wright found the victim's wallet inside the glove compartment and the defendant's written prescription for Hydrocodone in the back seat. A search of the victim's name revealed he was the victim of a recent robbery in a case assigned to Detective Coleman Womack. Detective Wright notified Detective Womack that he had found the victim's wallet and the defendant's prescription inside the Malibu.

On December 8, 2016, the victim met with Detective Womack to view two six-person photographic lineups, one of which included a photograph of the defendant. The victim identified the defendant and told Detective Womack the defendant carried a chrome, semi-automatic handgun during the robbery.

On December 17, 2016, MNPD Detective Gary Shannon and another officer arrested the defendant during a separate and unrelated investigation of suspected drug-related activity. When the officers knocked on the door at 2416 25th Avenue North, the

defendant answered wearing only boxer shorts and had "a red fluid that looked like it could have been blood" on his hands. Dejuan Crutcher and Keontay Martin were also inside the residence. Detective Shannon noticed Mr. Martin also had a red blood-like fluid on his hands. During a search of the residence, the officers found two handguns: a "Bryco 59" 9 millimeter and an "Astra 100." Both guns had a red blood-like fluid on them. The defendant's pants were found in the same bedroom as the two guns. After finding marijuana inside the residence, the officers arrested the defendant, Mr. Crutcher, and Mr. Martin for possession of narcotics. When asked on cross-examination if he submitted the guns to the lab for DNA and fingerprint analysis, Detective Shannon answered in the affirmative. Detective Shannon, however, was not asked about the results of the testing.

According to Detective Womack, the handguns found in the defendant's possession were similar to the description of the guns provided by the victim. Therefore, he photographed the handguns and called the victim to see if he could identify them. The victim told Detective Womack that the guns in the photographs were very similar to the guns used during the robbery. Detective Womack explained that "[o]bviously, [the victim] can't say 100 percent that those are the same guns, but they were the same type, the same color, same size that [the victim] described when he was robbed." On cross-examination, Detective Womack admitted the victim's previous description of the brand and model names of the guns did not match those found when the defendant was arrested; however, "[t]he general description was similar."

Detective Womack met with the victim a third time in January 2017 to review another photographic lineup to determine whether the victim could identify the defendant's accomplice. The lineup included a photograph of Mr. Martin, which "stuck out" to the victim, but he could not make a positive identification.

The State also called John Pogue, a nurse in the emergency room at Metro General Hospital. Nurse Pogue treated the defendant in the emergency room on December 4, 2016, for a gunshot wound the defendant had suffered to his leg on December 2. According to the medical records, the defendant arrived at the hospital on December 4 at 11:53 a.m. and was discharged at 12:41 p.m. the same day. The medical records also showed that the defendant was able to walk and that he was provided with a prescription for Hydrocodone and two other medications when he was discharged.

After the State rested its case, the defendant presented alibi testimony from his grandmother, Sandra Dillard, and his aunt, Camilla Dillard, who both recalled the

defendant being at Sandra's house at the time of the robbery.[1]  Sandra testified the defendant came to her house at 8:30 p.m. on December 4, 2016, after being discharged from the hospital, and stayed until the next morning.  According to Sandra, the defendant gave her his prescription for Hydrocodone and asked her to have it filled for him.[2]  When Sandra left for the pharmacy at approximately 10:00 p.m. to fill the defendant's prescription, she noticed a suspicious car down the street with its lights shining toward her house.  While driving away, she realized she forgot her money and returned home to find a man standing on her front lawn.  The man asked if the defendant was inside. Fearing the man was planning to harm the defendant, Sandra told him that the defendant was not there.  After the man left, Sandra went inside, locked the door, activated her alarm system, and called Camilla for help.  According to Sandra, Camilla called 9-1-1, and police officers arrived at her house around 11:00 p.m.  Sandra provided no additional testimony regarding the encounter with the officers.  On cross-examination, the State asked Sandra why she did not mention attempting to leave for the pharmacy in her preliminary hearing testimony, to which she replied, "I did tell all that," and "I don't know why y'all didn't get all that . . . ."

Camilla Dillard testified Sandra called her at approximately 9:00 p.m. on December 4 and told her to come to the house.  According to Camilla, she arrived at the house around 10:00 p.m. and saw the defendant inside on the couch.  Camilla also noticed a suspicious car parked down the street and decided to drive her car around the block to scan the neighborhood.  She called 9-1-1 approximately twenty minutes after leaving the house.

The defendant next called MNPD Officer Terrance Stuckey to testify.  Officer Stuckey responded to the 9-1-1 call from Camilla.  The dispatch report indicated Camilla called 9-1-1 at 11:46 p.m. on December 4, 2016.  Officer Stuckey and Officer Justin Vaughn arrived at approximately midnight.  Officer Vaughn spoke to Sandra in the front yard while Officer Stuckey looked around for the suspicious car and spoke to Camilla. The officers then patrolled the area but did not find the car.

During closing arguments, defense counsel reminded the jury that the guns found when the defendant was arrested had been submitted for DNA and fingerprint testing. Defense counsel then stated, "did the State show you prints of either gun?  Did they show

---

[1] Generally, we refer to witnesses by their last names for the purpose of efficiency.  However, because Sandra Dillard and Camilla Dillard share the same last name, we will refer to them as "Sandra" and "Camilla," respectively.  In doing so, we intend no disrespect.

[2] Sandra made an in-court identification of the prescription the defendant gave her, which was the same prescription Officer Wright found in the silver Malibu.

you DNA? No." After the defendant's closing argument, the following bench conference took place:

[THE STATE]: He said during his closing argument, he brought up the DNA evidence and the fingerprint or what the blood evidence and it leads the jury to believe that I didn't like the results wherein it is . . . (interrupted.)

THE COURT: I thought that you were treading on very dangerous ground when you made that statement.

[THE STATE]: I feel like I need to be able to tell the jury that those results are out there and the defendant choose (sic) to proceed to trial without the results.

THE COURT: Now, the fingerprints are one thing.

[THE STATE]: I'm just talking about the blood.

THE COURT: When you made that statement I really, as soon as you made that statement about the DNA evidence I thought that you were treading on very dangerous ground because you opened a door that I thought we had addressed pre-trial and [the State] needs to be able to explain it.

[DEFENSE COUNSEL]: In pre-trial my debate was the State had a year and a half to produce this evidence. It is not our responsibility for them to produce it.

THE COURT: Right. But when you, but you knew that it was out there still pending and you chose, you and your client chose to go ahead and proceed to trial without it, knowing that the results were still pending. You opened that door.

[DEFENSE COUNSEL]: And I have no objection to him talking about DNA evidence, but if he wants to talk about fingerprint evidence?

THE COURT: Well, I am not talking about the fingerprint. I am talking about the DNA.

[THE STATE]: I just want to address the issue of the outstanding tests.

- 5 -

[DEFENSE COUNSEL]: That's fine.

THE COURT: All right.

The State was then given an opportunity to rebut the defendant's closing argument, stating in part:

> This is my opportunity to rebut what you just heard and one of the things I want to address really quickly was you just heard [defense counsel] mention that there was some DNA evidence pending on the blood that came back from those guns. The reality is that test is still pending. The defendant chose to proceed to trial today knowing that.
>
> . . .
>
> Those DNA tests are still pending and the defendant chose to go to trial today knowing those tests are still pending. I will leave it to you guys to decide why that decision may or may not have been made by them.

The defendant objected, arguing that the State should not be able to "testify from the podium" that the defendant wished to go to trial without the DNA evidence. The trial court overruled the objection and allowed the statement.

After hearing all of the testimony and weighing the evidence, the jury found the defendant guilty of aggravated robbery.

### B. Sentencing Hearing

The victim, Sandra Dillard, and Camilla Dillard testified at the sentencing hearing. The victim testified the robbery took the joy out of riding his bicycle, especially at night when he feels vulnerable. He stated he hoped the defendant would take advantage of rehabilitation programs while incarcerated. Sandra testified the defendant's father had been in and out of jail for drugs and that his mother had always been a gambler. The defendant looked up to his step-brother before his death a few years prior. Sandra explained that his step-brother's death devastated the defendant and left him without a male role model in his life. Camilla testified the defendant has always longed for his mother and father's love. Camilla and Sandra took care of the defendant for most of his life. Camilla testified she has noticed a positive change in the defendant's attitude since being incarcerated. Upon the conclusion of the evidence, the trial court sentenced the defendant to 10 years' incarceration.

The defendant filed a timely motion for new trial. After considering all of the arguments, the trial court denied the motion. This timely appeal followed.

## *Analysis*

On appeal, the defendant argues the trial court abused its discretion by allowing: (1) Mr. Battle's testimony concerning his stolen car; (2) Detective Shannon's testimony that he observed a red, blood-like fluid on the defendant's hands and on the two handguns; and (3) the State to "testify" in its closing argument that the defendant chose to go to trial despite knowing the DNA results were pending. The defendant also argues he should be granted a new sentencing hearing because the trial court improperly applied enhancement factor (10). The State contends: (1) Mr. Battle's testimony was necessary to establish a timeline and was not unfairly prejudicial; (2) Detective Shannon's testimony established a nexus between the guns used in the robbery and the defendant; (3) the State was properly allowed to rebut statements the defendant made in closing argument; and (4) the length of the defendant's sentence is presumptively reasonable, and the defendant has failed to overcome the presumption. We agree with the State.

### A. Testimony of Mr. Battle

The defendant argues the trial court erred by allowing Mr. Battle to testify his rental car, a silver Chevrolet Malibu, was stolen on the evening of the robbery. Specifically, the defendant suggests Mr. Battle's testimony should have been excluded under Tennessee Rule of Evidence 404(b) because it constituted evidence of "other crimes, wrongs, or acts." *Id.* He also argues Mr. Battle's testimony should have been excluded under Rule 401 because it was irrelevant to the aggravated robbery charge. Tenn. R. Evid. 401. Finally, the defendant argues the prejudicial effect of the testimony outweighed its probative value by implying the defendant was involved in the car theft. Tenn. R. Evid. 403. The State contends Rule 404(b) is inapplicable because Mr. Battle's testimony did not suggest the defendant stole the vehicle and was provided as probative, contextual evidence. The State also argues the testimony was not unfairly prejudicial because the trial court issued a limiting instruction directing the jury not to consider the defendant as being involved in the theft of the vehicle.

Rule 404(b) generally prohibits "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity with the character trait." *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014); Tenn. R. Evid. 404(b). Rule 404(b) allows such evidence in limited circumstances for purposes other than proving action in conformity with a character trait. *Jones*, 450 S.W.3d at 891. Our Supreme Court has recognized that evidence of crimes, wrongs, or other acts may be admissible as

contextual evidence in some instances. *State v. Gilliland*, 22 S.W.3d 266, 271-72 (Tenn. 2000). "If the contextual evidence is relevant to an issue other than criminal propensity and its probative value is not outweighed by the danger of unfair prejudice, then the evidence may be properly admissible." *Id*. at 271. However, contextual evidence should not be admitted if it would "rupture the general prohibition against evidence offered only to show criminal propensity." *Id*. at 272.

The determination of whether evidence is relevant is governed by Tennessee Rule of Evidence 401. Evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant evidence "may be excluded if its probative value is substantially outweighed by . . . the danger of unfair prejudice." Tenn. R. Evid. 403. Unfair prejudice refers to evidence with "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one." *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978).

Mr. Battle testified his rental car, a silver Chevrolet Malibu, was stolen around 4:15 p.m. on December 4, 2016. Approximately five hours later, the defendant exited a silver Malibu and robbed the victim. When the stolen vehicle was found, impounded, and searched, officers found the victim's wallet and the defendant's Hydrocodone prescription inside the vehicle. This evidence was then provided to the officers investigating the robbery. While Mr. Battle's testimony could support an inference that the defendant was involved in the theft of the Malibu, the State did not accuse the defendant of doing so. Rather, Mr. Battle's testimony was introduced to provide a contextual background as to how the defendant was developed as a person of interest in the robbery of the victim. Therefore, the testimony was relevant to the timeline of events surrounding the robbery and was not introduced as evidence that the defendant was involved in the theft of the vehicle. Moreover, the trial court limited the impact of Mr. Battle's testimony by instructing the jury that the evidence was introduced only as contextual background evidence and that the defendant "is not charged in this case with theft of a vehicle, and you should not concern yourself with that fact, as theft of a vehicle is not the subject of this trial." This Court presumes the jury followed the trial court's instructions. *State v. Joshua R. Starner*, No. M2014-01690-CCA-R3-CD, 2016 WL 1620778, at *21 (Tenn. Crim. App. Apr. 20, 2016) (citing *State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006); *State v. Shaw*, 37 S.W.3d 900, 904 (Tenn. 2001)). Because the testimony was relevant as contextual background evidence and was accompanied by a thorough limiting instruction, the defendant was not unfairly prejudiced by the testimony, and the trial court did not abuse its discretion in admitting the testimony. Thus, the defendant is not entitled to relief on this issue.

*B. Testimony of Detective Shannon*

The defendant next argues the trial court abused its discretion in admitting Detective Shannon's testimony that he saw a blood-like substance on the defendant's hands and on the handguns found in the defendant's possession at the time of his arrest. The defendant contends that because the guns "were never definitively tied to the robbery," and "[t]he State's own witnesses differed on the identification of the handguns," Detective Shannon's testimony had little probative value and only served to prejudice the defendant by introducing inflammatory evidence. The State argues that Rule 404(b) is inapplicable and that Detective Shannon's testimony established a nexus between the defendant and the handguns used in the robbery. We agree with the State.

When Detective Shannon arrested the defendant, he noticed a red blood-like fluid on the defendant's hands. During a search of the residence, Detective Shannon found two handguns covered in a similar blood-like fluid in the same room as the defendant's clothes. These handguns matched the description of the guns used in the robbery. In allowing the testimony, the trial court concluded the evidence of a blood-like fluid on the defendant's hands and on the handguns connected the defendant to the handguns. Thus, Detective Shannon's testimony, when assessed together with the rest of the evidence, including the victim's identification of the guns, provided circumstantial evidence that the guns found in the defendant's possession were the same guns used by the defendant and his accomplice in the robbery. While we acknowledge the testimony was somewhat prejudicial to the defendant, we nevertheless conclude the trial court did not abuse its discretion as the testimony aided the jury in connecting the defendant to the guns and the robbery. Therefore, Detective Shannon's testimony was permissible under Rules 403 or 404(b).

The defendant also argues Detective Shannon's testimony should have been excluded because the guns found in his possession "were never definitively tied to the defendant." In support of his claim, the defendant points to an alleged discrepancy between Detective Womack's testimony and the victim's identification of the handguns. Detective Womack testified the victim told him the handguns found at the time of the defendant's arrest were very similar to those used in the robbery. Though the victim was not "100 percent" certain the guns were the same, "they were the same type, the same color, same size that [the victim] described when he was robbed." The defendant suggests Detective Womack's testimony contradicted the victim's identification of the handguns by showing the victim was not positive the guns were the same guns used in the robbery. However, this issue relates to the weight of the evidence, which was resolved by the jury. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). By finding the defendant guilty of aggravated robbery, the jury clearly determined the defendant was the perpetrator of the robbery and accomplished the robbery with a handgun. This Court shall not reweigh

the evidence or substitute its inferences for those drawn by the trier of fact. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). For the foregoing reasons, we conclude the trial court did not abuse its discretion in allowing Detective Shannon's testimony at trial.

### C. Closing Argument

The defendant next argues the trial court abused its discretion in allowing the State to present an improper closing argument. Specifically, the defendant asserts the prosecutor improperly commented on the defendant's decision to go to trial instead of waiting for DNA results. The State argues the prosecutor properly rebutted improper statements made by defense counsel during closing argument. We agree with the State.

"An appellate court should not lightly overturn a criminal conviction 'solely on the basis of the prosecutor's closing argument.'" *State v. Hawkins*, 519 S.W.3d 1, 48 (Tenn. 2017) (quoting *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008)). A prosecutor's closing argument "must be evaluated in light of the defense argument that preceded it." *State v. Thomas*, 158 S.W.3d 361, 414 (Tenn. 2005) (appendix) (citing *Darden v. Wainwright*, 477 U.S. 168, 179 (1986)). In considering the circumstances surrounding the prosecutor's closing argument, "the appellate court may consider whether the improper remark was 'triggered' by defense counsel's closing argument." *State v. Brice Cook*, No. W2012-00406-CCA-R3-CD, 2013 WL 9570493, at *17 (Tenn. Crim. App. Sept. 4, 2013) (citing *State v. Jordan*, 325 S.W.3d 1, 65 (Tenn. 2010)).

After the defendant was arrested, Detective Shannon sent the two handguns found in the defendant's possession to the crime lab for fingerprint and DNA analysis. During a pre-trial hearing, the State announced the test results were still pending and offered the defendant the opportunity to continue the trial until the results came back. The defendant, however, elected to go to trial without the DNA results. Because the results were still pending, the trial court directed the defendant to refrain from asserting there was no DNA evidence. At trial, the State did not question Detective Shannon about the DNA testing. However, on cross-examination, the defendant asked Detective Shannon if he submitted the guns for DNA and fingerprint analysis, which he answered in the affirmative. The defendant did not ask if the lab results had been returned. Then, during closing argument, the defendant reminded the jury that Detective Shannon had submitted the guns for DNA testing and stated, "[d]id the State show you prints of either gun? Did they show you DNA? No."

During a bench conference after the defendant's closing argument, the trial court agreed with the State that the defendant's comments were inappropriate and that the State should be allowed to explain to the jury that the DNA results were still pending when the

trial started. Therefore, on rebuttal, the State commented to the jury: "[Y]ou just heard [defense counsel] mention that there was some DNA evidence pending on the blood that came back from those guns. The reality is that test is still pending. The defendant chose to proceed to trial today knowing that." The defendant objected, and the trial court overruled the objection.

In denying the motion for new trial on this issue, the trial court explained that "but for defense counsel's suggestion that there was no DNA evidence connecting the [d]efendant to the gun, contrary to the [c]ourt's pre-trial ruling regarding the evidence, there would have been no need for the State to cure defense counsel's suggestion." We agree with the trial court's reasoning. The trial court expressly limited the defendant from asserting there was no DNA evidence. When the defendant made such an assertion in closing argument, he invited the State's response in rebuttal. *See Jordan*, 325 S.W.3d at 65 ("While the prosecutor reached too far in his argument, it appears that the prosecutor was at least trying to place his argument in some overall context triggered by the argument of defense counsel."); *see also Thomas*, 158 S.W.3d at 414-15 (no reversible error occurred when the trial court allowed the prosecutor to make an otherwise improper statement in closing argument because the prosecutor's statement was an "invited response" to defense counsel's improper statement, and it did not affect the trial as a whole). The trial court did not abuse its discretion in allowing the State to explain why there was no DNA evidence presented at trial. The defendant is not entitled to relief on this issue.

*D. Sentencing*

Finally, the defendant challenges the trial court's application of enhancement factor (10), arguing the high risk to human life necessarily exists when the crime involves the possession of a deadly weapon. *See* Tenn. Code Ann. 40-35-114(10). The State contends the trial court exercised proper discretion in determining the length of the defendant's sentence. While we agree with the defendant that enhancement factor (10) does not apply, we uphold the sentence imposed by the trial court.

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b). In addition, "[t]he sentence imposed

should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(4).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory presumptive minimum sentence and rendered enhancement factors advisory only. *See* Tenn. Code Ann. §§ 40-35-114, -210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114." *Id.* § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." *Id.* § 40-35-210(e).

When an accused challenges the length and manner of service of a sentence, this Court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Id.* at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In sentencing the defendant, the trial court considered the evidence presented during the sentencing hearing, including the presentence report, the testimony offered, and the arguments of counsel. In reviewing the applicable enhancement factors, the trial court found enhancement factors (1), the defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (10), the defendant had no hesitation about committing a crime when the risk to human life was high; and (16), the defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult. Tenn. Code Ann. § 40-35-114(1), (10), (16). The trial court declined to apply enhancement factor (9), the defendant possessed or employed a firearm or other deadly weapon during the commission of the offense. Tenn. Code Ann. § 40-35-114(9).

In applying enhancement factor (1), the trial court considered the defendant's prior conviction for theft and his extensive juvenile record, which included resisting arrest, assault of a police officer, vandalism, car theft, gambling, theft, trespass, and domestic assault. In applying factor (10), the trial court considered that "anytime a weapon is involved there is a substantial risk to human life," that there was at least one other person possessing a firearm, and that the victim was traveling home from work at night. In applying factor (16), the trial court considered that the defendant was adjudicated to have committed a car theft as a juvenile, which would constitute a felony if committed by an adult. In declining to apply enhancement factor (9), the trial court reasoned that possession of a firearm is an element of the crime of aggravated robbery. Tenn. Code Ann. § 39-13-402. The trial court found no applicable mitigating factors and sentenced the defendant as a Range I offender to ten years' incarceration.

We agree with the defendant that the trial court misapplied enhancement factor (10). "[T]here is necessarily a high risk to human life and the great potential for bodily injury whenever a deadly weapon is used." *State v. Nix*, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995) (holding that enhancement factor (10) does not apply to aggravated robbery); *State v. Hill*, 885 S.W.2d 357, 363 (Tenn. Crim. App. 1994) (holding that enhancement factor (10) does not apply to aggravated assault). Thus, factor (10) should not be used to enhance a conviction for aggravated robbery, a crime for which possession of a deadly weapon is an essential element. *Nix*, 922 S.W.2d at 903.

Notwithstanding the trial court's misapplication of factor (10), the defendant's sentence is presumed reasonable. As previously stated, a trial court's misapplication of an enhancement factor will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. The defendant had a prior felony conviction and an extensive juvenile record. Therefore, the trial court did not misapply enhancement factor (1), nor does the defendant challenge its application. In addition, the trial court properly considered the defendant's juvenile adjudication for car theft as an act that would have constituted a felony if committed by an adult. *See* Tenn. Code Ann. § 39-14-105. Therefore, the trial court did not misapply enhancement factor (16), nor does the defendant challenge its application.

Our review of the record indicates the trial court imposed a within-range sentence after properly considering the evidence adduced at trial and the sentencing hearing, the presentence report, the principles of sentencing, the parties' arguments, the nature and characteristics of the crime, and evidence of mitigating and enhancement factors. Tenn. Code Ann. §§ 40-35-103(5), -114, -210(b). Therefore, the trial court did not abuse its discretion in sentencing the defendant, and the defendant is not entitled to relief.

- 13 -

### *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
J. ROSS DYER, JUDGE